The first case for oral argument is Meridian Village Association v. Hamer. Counsel, when are we ready? Without my glasses, I'd better try. Okay. May it please the court. Counsel, my name is Ellen Edmonds. I represent Edwardsville Community Unit School District No. 7. There are three other appellants in the case similarly aligned. The Village of Glen Carbon, the Madison County Board of Review, and the Illinois Department of Revenue. Pursuant to Illinois Supreme Court rule, only two attorneys will be presenting argument this morning. Myself and Attorney Tim McPike from the Attorney General's Office on behalf of the Department of Revenue. This case involves a review of a Department of Revenue decision denying a property tax exemption to Meridian Village, a retirement community, based on a religious use and charitable use exemption claim. The circuit court reversed the decision in part of the Department of Revenue and affirmed in part, finding that Meridian Village had established charitable use but finding that Meridian had not established religious use. My main argument will focus on the charitable exemption as that is the basis of appellant's appeal. This court reviewed the decision of the Department of Revenue and not the decision of the circuit court, but I nonetheless want to discuss the circuit court decision for the reason that it is similar to another decision out of the Madison County Circuit Court several years ago, the Eden decision, that eventually ended up before the Illinois Supreme Court on similar issues. In both cases, the Madison County Circuit Court reduced the standards of approving charitable use by retirement communities. In the Eden decision, the Madison County Circuit Court indicated that a retirement community was not required to approve actual charitable use, but rather so long as certain statutory prerequisites were met, such as federal tax exempt status and certain bylaw language, that that was all that was necessary to be shown. The Illinois Supreme Court said that the introductory language of Section 1565 of the Property Tax Code, which says that identified types of property are exempt, quote, when actually and exclusively used for charitable or beneficent purposes, not only was required to be given effect, but also that that language was constitutionally mandated by Article IX, Section 6 of the Illinois Constitution. In this case, the Madison County Court likewise disregarded in its effect the requirements of actual and exclusive charitable use under Section 1565 and the Illinois Constitution. In the decision, the circuit court indicated that it is not feasible to require a retirement community to provide residence for anyone, whether they can afford it or not, and therefore did not impose that requirement on the retirement community as a condition of securing a charitable exemption. Numerous Illinois courts reviewing the constitutional requirements of proving charitable use and also the statutory requirements have reiterated that it is necessary for a facility to provide charity to all who need and apply for it. Didn't Eden make a requirement that it must dispense charity to all that need and apply? Yes, yes. There are numerous. The first seminal case was the Methodist Old People's Home case. It had that requirement. Eden had that requirement. There are numerous. Some cases just didn't address the issue, but other Supreme Court cases have specifically said that you must provide it to all who need and apply for it. And there are numerous cases that say a discretionary provision of charity or a provision of charity based on the financial circumstances of an entity is not sufficient. What is your financial control? Do you just have a certain stop level of occupancy? No, I think the distinction is, if you look at the courts, I don't think, or the cases, the Illinois courts have consistently denied a charitable exemption to retirement communities, and I think the distinction is what facility, if a facility is operating as a business, and I don't mean in a tax exempt status way, but just generally it's operations as a business model or operating as a charity. And I think there's a reason why none have ever been given a charitable exemption, because most of them are really not charities. They are in the business of providing senior housing. And so, for example, let's say that a retirement community, or let's say a group of people got together and said, you know, we've got a lot of retirement communities in our location poor and wealthy, but those senior housing facilities are not affordable for most people in our community, and we are going to create a facility that is affordable to all, and that's why we're creating the facility. And now, in that scenario, like the Circuit Court said, it's not feasible to just accept everybody in based on a fee structure. You're going to have to operate as a charity. You're going to have to devote substantial time and resources toward raising charitable funds so that anybody that's admitted can live there without paying. So is it conceivable that a retirement community could pass muster under the constitutional standards? Yes. Has one done it in Illinois before? I doubt it. Yeah, yeah. It's a very difficult standard. An impossible standard almost. Yeah. Because you have no funds to support your unit. And I think if the goal is to simply provide senior housing, that's correct. If the goal, on the other hand, is to create and carve out an institution for the purpose of providing housing to those who can afford it, it's all a matter of how much fundraising you do. It's certainly not impossible. It would be difficult. It's going to take a lot of work. And, again, that begs the question, what is a charity and what's not a charity? And essentially what the circuit court said here is it's not feasible to expect or reasonable to expect a business to operate as a charity. Well, that's true. But if it's a business, it's not a charity. So if it's not a charity, it doesn't get a charitable exemption. And the Supreme Court has said that those words mean something, that they must be applied in a particular way, that neither the legislature nor the courts can lower those standards. What case gives you that definition of charity in Illinois? The definition about, are you talking about not providing? It has to be 100%. I'm sorry? It has to be 100%. Oh, there's nothing that says it has to be 100%. There's no case in Illinois that says you have to take everybody. Let me make a distinction. There's no case that says 100% of your people have to be charity cases. There are many cases that say, though, that you have to accept anyone who can't afford. It can't be discretionary. And that means out-of-state, too? Out-of-state also? I'm not aware of any courts that distinguish between in-state or out-of-state. But what they do say is that the facility has to be obligated through its own policies and procedures or through its bylaws to accept anybody who cannot afford the facility. So they establish charitable criteria, and if someone meets it, they have to take them. That's correct. Now, I don't know what would happen in a scenario where they breach capacity at that point. If they have always done that, I don't know that they necessarily have to kick somebody out. I don't know. I'm not taking a position on that. I was really wondering, as a financial matter, how do you handle that? And apparently, if there's room, they have to take them if they meet the criteria, is what you're saying. Yeah, I think that's correct under both Supreme Court and appellate court decisions in the state of Illinois. I want to discuss the—first of all, let me just jump back a second. I mentioned before, it was not within the power of the circuit court to lower the requirements based on business feasibility. The circuit court's role was limited to determining whether the record supported the Department of Revenue's decision. And the Methodist Old People's Home Standards are the ones that have been applied consistently by the courts in Illinois. I'm not going to go through every single standard in detail because that's been done thoroughly and in brief, but I do want to focus on some points that I think are very important. And the first two in particular, I believe, are dispositive. The first two are that, first, the ALJ found that Meridian had not established that it received any charitable funding in the year 2000. And I think there's no dispute that the record does not establish that Meridian itself did any fundraising in the year 2000. I think that's not arguable. There is an argument about advances from the parent corporation during that year, and Meridian's attorneys are arguing, well, those weren't loans, and it was during the start of the year when most of these facilities— Well, it gets me on that, but I was having a little difficulty. How do you ever start one where the first year is not charitable? It's always non-charitable the first year of that because you can't—unless you—I guess you have to have a fundraiser without an entity. Yeah, I mean, I think you certainly can do it. It's just— How do you start? That's what I want to know. Yeah, you're going to have to raise money. You're going to have to draw pictures? Well, you can't pay the guy for drawing the pictures, can you? Right, you have to have a fundraiser for that as well. Or if you're going to allow people in for a fee during that first year, then you also need to be allowing people in who cannot afford it, and as many as apply during— Well, you've got to get it built. See, I don't know how you can build it. Fundraising. And then you've got to raise the funds on a picture, on an idea. Yeah, it's difficult. I mean, again, that's, I think, why the courts in Illinois have consistently found that retirement communities don't qualify. I think it's a very difficult showing to make for that type of a facility. Fundraising can come from a donation from the church. Certainly. It doesn't have to be independent of the church, right? Certainly. And there were start-up costs that were funded through Lutheran Church, and that's one of the arguments that we made is that the circuit court relied heavily on donations years before the tax year in question, and we pointed out that the Illinois courts say it's the factors of charitable use apply to the year in question. What is the funding that year? What is the use during that year? And that's 2000. That's 2000, yes. And we've cited cases that also say you can't look back to years before and say, well, there was funding when there was use in this year, and therefore you should presume it in a later year. So as far as the fundraising in 2000, there was a dispute about whether the advances from LCFS, the parent corporation, were loans or whether they were charity. And the point that I want to make is that the circuit court might have disagreed. The Department of Revenue said, no, the Meridian has not proven that those were charity as opposed to loans, and the circuit court said, well, I disagree. I think they were charity. The court's role wasn't to disagree or re-weigh the evidence. The circuit court's role was to determine whether there was evidence to support the Department of Revenue determination, and the evidence was that no witnesses ever referred to those advance funds as charity. The funds that were advanced were listed on Meridian's financial statements as a liability, and those funds were eventually reimbursed. So there certainly is support in the record for the Department of Revenue's conclusion that Meridian did not establish that, and if that's the case, then her findings of facts, the ALJ's findings of facts are prima facie true. It must be accepted if they're not against the manifest way to the evidence. The second point is that the ALJ found that the allocation of the $30,000 of financial aid, and by the way, Meridian wasn't making money that year, but they nonetheless parked out this $30,000, and there's facts about letters between the lawyers and so forth about they had to have certain, had to do certain things for the property tax exemption that's in the record. She found that it was done as a business decision in order to qualify for a property tax exemption. So I think those two things, if you, again, they're supported by the record. We have to accept her conclusions as true. So if we accept that as true, then there's no charitable funding in the tax year in question, and there was no charitable giving because allocation of $30,000 as a business, in reduced fees as a business decision in order to secure a property tax exemption is not charity. And so I think right there, if you have an entity who doesn't have charitable funding in the tax year in question and has no charitable giving, that should be the end of the consideration or could be the end of the consideration. Nonetheless, I want to go on. I think the next important consideration is that in filing this property tax exemption, Meridian Village sought to avoid payment of over $160,000 in taxes by reducing $30,000 in fees, and therefore they clearly were not reducing the burdens of government. Did they use the $160,000 savings for charitable purposes? Is there any evidence about that? There's no evidence about that, I believe, and I could be incorrect and Meridian's attorneys could say, but I think they ultimately maybe paid the ‑‑ they may have actually paid that and they may be getting a refund. I'm not ‑‑ without reviewing the record, I can't recall the details on that, but I think they may have paid that and would get a refund. And the fee waivers were limited to three people, therefore they did not provide charitable care to all who needed and applied for it. They did not provide charitable care to an indefinite number of people, and there were numerous obstacles, no advertising that they can prove of the charitable care policy, and they admit they didn't follow their charitable care policy. Market rates, variable fees based on desirability, financial screening of everyone, security deposits even for those who receive the financial reduction or the fee reductions, entrance and preconstruction fees by some, and very businesslike rental agreements that required them to be able to pay monthly fees and also allow for eviction upon nonpayment. I think I've just about come in close to intruding upon Mr. McPike's time, so I'm going to conclude for now. Thank you. Thank you, counsel. Counsel? May it please the Court, counsel, Timothy McPike, Assistant Attorney General, representing the Department of Revenue. I'm just going to address the religious use issue, and I'm only going to make two brief points, emphasize those points are in my brief. The first is because Meridian has raised a constitutional challenge, the Illinois Supreme Court's mandate, as stated in Ulch v. Illinois Municipal Retirement Fund, a 2007 decision, is that courts may not reach the constitutional issue if there is a dispositive non-constitutional ground. In this case, Section 1540 of the Property Tax Code, which provides the religious exemption, requires that you may not get a religious exemption if there is evidence that you've used the property with a view to profit. So I respectfully suggest that this Court should address the view to profit issue, and if it finds that that issue is dispositive, then it should not reach the constitutional issue. We believe that there is ample evidence in the record that the property was used with a view to profit, and because Meridian had the burden to show by conclusive evidence that it did not use the property with a view to profit, therefore it did not meet that burden. As long as there is some evidence in the record, it did not prove conclusively that it did not use the property with a view to profit. And I'll just quickly review some of the things, the legal requirements. First of all, you cannot get an exemption if there is evidence of a view to profit, and that's this Court's decision in the Three Angels case back in 2008. Second of all, it's irrelevant whether you actually made a profit in the tax year in question. It is the intention of the owners, whether they intend to make a profit in the tax year in question. That is the Turverin-Lincoln case, 1934 Illinois Supreme Court case, and the first Presbyterian versus Dixon case, the second district, in 1999. The intent of the owner, not whether you actually made a profit. In 2000, it's undisputed that Meridian did not make a profit, but losing money does not qualify, does not support an inference that you intended to be non-profit. You have to look to the intention. So we look to the intention, and the facts in this case are that it's in the record that they had to turn away 19 people who applied for charitable housing because, as they stated, quite frankly, we need to have some paying people here in order to fund our property. So the fact, the record is very clear. How they intended to fund this property, the operating expenses, was by having enough paying people in. And if that is your model, then you are generating revenue. And if you're generating a profit, then you do not. Well, now you say revenue and profit, the revenue are two different things. Well, yes. Why do you need to interchange them? I think it has to do, you're generating revenue, but not enough to pay the bills. That's not profit. If you paid all the bills, that'd be profit. Yes. If you paid all the bills, you'd have some left over. So what you just said is not true. Well, it's true because remember, it's not that they actually made a profit that year. Just if you generate revenue, you're not... If your intention is to fund your property... With the revenue you take in... Right. You can't... Right. So that is pretty clear. Their business model was to have enough revenue producing people to fund it. And it doesn't make any difference now that they were using that, the profit that they made. No, revenue. Well, I'm talking about assuming that they made a profit. Oh, they made a profit. Okay. They didn't. It's clear they didn't. But the fact that they did not make a profit in the tax year does not mean that they were intended not to profit. It's the intent. So you have to look at the business model. You have to look at what their intention is. It's very clear from this record that their intention was to fund their operations by generating fees. And if you're doing that and assuming you're going to make excess... If you're intending not to break even every year and your business model is to not ever break even or to do better, and you're going to make up for that deficit by charitable or other means, then you're not using the property with a view to profit. But if you're using the property to generate funds, even if you're going to use those funds for charitable purposes, that still is considered using the property with a view to profit. And the seminal case of that is the YMCA case, which says you can take in some money from fee-paying people as long as you're not turning anybody away, as long as you're not making a profit. And then there is the Salvation Army case, I believe it's the 1st District, which says that they compared Salvation Army to St. Vincent de Paul. Salvation Army made money from the donations, and they used their money for charitable purposes. No, I'm sorry, that's a view to profit. St. Vincent de Paul takes money in, and they have some money, but they've never made money. So, my time is up. Thank you very much. Councilman? May it please the Court. Your Honor, my name is John Gerris, so I represent Viridian Lutheran Church. I come before you today really to address the two issues on appeal. There's actually four, a couple of procedural issues. I want to start first by talking about Provena, because they cite Provena, they cite the Appellate Court argument, they cite the Supreme Court argument throughout their briefs. Provena is a very narrow plurality of opinions. There's two justices who joined three justices out of two very narrow issues. They said there was no evidence whatsoever that the owner of the property, Provena Hospitals, was, any evidence was put out about its religious use for purpose or its charitable use for purpose. And that's what the two joined the three. That's the narrow ruling of the case. That's the only precedent of the case. It's not starting to seize us in any other respect. Everything else is dictum, and though they keep citing it over and over again, it also doesn't apply to this case because there's no question that the owner of the property, Viridian, and the operator of the property, Viridian, was the same entity. So you don't even get to the Provena decision. So I wanted to start with that just for clarity purposes. Let me address first the charitable argument. The Honorable Judge Harris, after hours of argument, issued a 13-page opinion, and his job isn't to go and find a way to support the administrative law judge. The question is, is the administrative law judge's ruling contrary to the manifest way to the evidence or clearly erroneous? Here we currently have questions of mixed back in question, but clearly erroneous standard, clearly the bottom. And he found in his 13-page opinion, and he correctly concluded, that if you look at the Methodist Old People's Homes guidelines, and they're guidelines, you don't have to satisfy all of them. If you look at those guidelines and you look at the way the evidence went in, the reality was that we met those guidelines, he said, in most of the circumstances. Now, he went on to say that, let's address the first two points he raised. Funds are derived primarily from public or private sharing. I think you said it well. Judge Harris has said the property came from the church. There was a donation from the Lutheran World Services, all part of the church, to fund the start-up. That was over $500,000 and a million in debt. Then when they were operating it, there was no fundraising in the sense of, yeah, there were spaghetti dinners, that sort of thing. But this is a major operation. Like you said, you've got to develop it, you've got to put it out. And the reality was that they funded the losses. The Lutheran Church Family Services funded a million dollars' worth of losses in the year in question. The first $2 million of revenues, a million dollars was funded by the Lutheran Church Family Services, which was the parent over rent. There's no question that it's all the church. It's all part of the church under their rules. There was all kinds of testimony that Meridian, Lutheran Children's Family Services, and then when they still got into trouble, when Meridian was still headed for bankruptcy, Lutheran Senior Services was asked by the Lutheran Church Missouri Synod to step in, bring more resources so that it could continue into the future. So when they talked about the money not coming from a public or private charity, in fact it did. And if you take that literally, funds only from public or private charity, nobody can meet that standard. Nobody can meet that standard. And, of course, don't require you to. The other standards that clearly were met, and this is where you've got to start with your question about what's the standard. If you look at the career case, the original case that cited in the Methodist Whole People's Homes case, if you look at the administrative law judge, she had like ten factors, ten guidelines. I don't know where she got ten. What she did was she took the three from career and turned those into three different standards. And what career says is if you take care of an indefinite number of people, in other words you're open to the public, and you do it either because you want to bring their hearts and minds under the influence of religion or wellness or living into the future. It's written in the Methodist Whole People's Homes case. If you try to do that for an indefinite number of persons, and you do that, that in and of itself is charity. And our position is, Your Honors, that the reality is that when you're aging, it doesn't matter whether you have funds or you don't have funds. You still have physical needs. And the church requires it, and the charity requires them to take care of those needs. That in and of itself, in their career, is enough to establish charity. But if you look at the rest of the Methodist Whole People's Homes case, they talk about the burden of government. We did relieve the burden of government, Your Honors. We did relieve the burden of government because if you live in an independent living unit, and that's what we have, independent living, you live longer, the record shows you live healthier, and you're less likely to go into the nursing home or into the assisted living, use up your assets, and end up on Medicaid. Clearly it shows, the whole concept of it is to, in fact, prevent and save dollars down the road. So the judge, Judge Harrison, will look at all this, and then he said, okay, let's look at this standard. All who need will apply. If you take that verbatim, by definition, if there is no financial parameter on what you can do, if we did more than what we said we could do, and the record says we did everything we could, we intended to do more, if we made more, we will do more, in terms of free care. Charity, by the way, isn't just free care. It's not just almsgiving. Lots of cases say that. But if we could do more, we would do more, and we said we would do more in the future if we had the dollars. That's all in the record. So to say that all who need will apply, and they talk about 19 people on waivings. Yes, people who were admitted who were charitable. Yes, we gave away as much charity as we could. Yes, the record indicates that we even exceeded the $30,000 that they referred to as part of our charity policy in all the years.  If we did more, if we filled up all the empty spaces with people who could not afford it, it wouldn't matter what the fundraising was, it wouldn't matter what the deep pockets were, there would be no charity for anybody because there would be no Meridian Village. So, you know, that whole standard, all who need will apply, the obstacles. Again, they talk about business or businesslike activities. The reality is you have to be able to have contracts. That doesn't mean you're commercial. The evidence in the record shows that we priced it at a medium price as the revenue was required. We priced it in a way so that most people could access it. That's what the record shows. And in addition to that, because we didn't have the nursing home yet built, that was a plan, but it wasn't yet built, we had to decide, we had to look at their health. That wasn't an obstacle, that was required by licensure. So their whole thing about the obstacles, blocking, you know, and we went on to show that we priced it as low as possible, record 704, 708, that they say, well, you know, you've got a contract that says you can evict somebody. Of course. If somebody had the dollars and they just didn't pay you, you wouldn't be able to evict them? You've got to have a term in the contract. That doesn't mean it's business. Just because you do prudent things doesn't mean that you're a commercial enterprise. And if you look at the last two pages of the judge's opinion, that's really where it comes down. It's a 13-page written number and opinion. He says Meridian is charitable. Meridian, while generated to be financially prudent, focused on the provision of benefits rather than any return. There's no shareholders. There's no investors. And the testimony said that if there were excess, it would go back into program, go back into charity. So there's no question that the judge looked at that and said, when you look at all the factors, including the outcome for a lack of specificity, and there was, as the record establishes, there was no opportunity at that point for any more specificity. And the only thing that 835 said is if you didn't request a hearing, then there was an outcome. But if there wasn't enough specificity, there was no outcome for that. And under that context, it's not jurisdictional. As far as the burden of proof, the burden is always on the exemption applicant. But I also want to reference his comment about the documentary evidence that we presented in our case in chief. Our case in chief was mostly documentary evidence, 1,800 pages of discovery. And then during their case in chief, there was a lot of additional witnesses that were examined. And the attorney stipulated that we would reserve argument until the end. And we were going to just do briefs. We did not present argument at the hearing. And Mr. Derso stipulated to that. And what he is objecting to is not what was in the documentary evidence. He is objecting to the fact that I did not comment on the significance of those items. And counsel had stipulated that we would not do so and that we would reserve those arguments for the briefing. On the religious use issue, well, first of all, let me also talk about the Provena decision. Two justices did not participate at all. Two participated in a separate opinion. And in those, both of the justices concurred in the part regarding religious use. And there were only two narrow issues in which they dissented. And that was they didn't want to establish a percentage threshold of charity for charitable use. And they didn't want a requirement that the applicant show reduction of burden to the local government. I think they were making a very fine distinction there. And in the Provena case, what the courts did talk about that I think is very important, that first of all, they reject Meridian's argument that Meridian gets to say what is religious use. The court says no, and the Supreme Court has said so in the past. It is always the judiciary that is the ultimate arbiter of religious use. It also said that a fee-based facility is not essential to a stated religious purpose. So even if Meridian's argument had to be accepted, even if they get to say that provision of housing to the elderly is per se religious use, a fee-based provision of housing to the elderly is not necessary or not essential to a religious stated purpose as the court of Provena indicated. Also, the mutual profit, this court, I don't know that the Three Angel case was mentioned, but this court had a decision specifically addressing the profit issue for not-for-profit or in this context. And it's different than not-for-profit for purposes of federal state or federal income tax exemptions. I think you've run over your time if you expect the Attorney General to say anything. Your Honors, I just wanted to quickly emphasize on the religious use issue. If you do decide to proceed to the constitutional issue of whether the courts can determine whether religious use, I think my counsel in our brief certainly cite all the Illinois cases that say no, the court is the determiner of religious use, accepting their sincere statement of religious intentions. But I also wanted to emphasize on our reply brief on page 28, the Living Faith case from the Seventh Circuit, which I think gives an even clearer theory than the Illinois cases about the constitutional issue, which is we can accept their assertion that providing housing for elderly people is a religious purpose, but it is also a secular purpose. And Mr. Durso attempted to give some distinctions, but I suggest to you that the record does not support those distinctions. There is testimony from their chairman that they provide the same services as a non-religious housing. That's at the administrative record on page 506, 508. There is essentially the same activities, whether it would be religious or not. So the fact, the Living Faith case in the Seventh Circuit says the fact that you can have two purposes for a given activity, one religious and one secular, means you lose. You don't get an exemption. And the Illinois law is you have to show that the religious purpose is the primary purpose. If you cannot distinguish those purposes, you cannot show that the religious purpose is the primary purpose. Thank you. Thank you, counsel. We appreciate the briefs and arguments of all counsel. We'll take this matter under advisement.